**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

|                                          |     |                    |
| ---------------------------------------- | --- | ------------------ |
| NIBCO INC.,                              | )   |                    |
|                                          | )   |                    |
|     Plaintiff,       | )   |                    |
|                                          | )   |                    |
|   vs.                          | )   | NO. 3:14-CV-00457  |
|                                          | )   |                    |
| ARTHUR J. GALLAGHER RISK                 | )   |                    |
| MANAGEMENT SERVICES, INC.                | )   |                    |
|                                          | )   |                    |
|     Defendant.       | )   |                    |
|                                          | )   |                    |

<u>OPINION AND ORDER</u>

This matter is before the Court on the Motion for Summary Judgment filed by Defendant Arthur J. Gallagher Risk Management Services, Inc. ("Gallagher") on July 2, 2015 (DE #38), and the Motion for Summary Judgment filed by Plaintiff NIBCO Inc. ("NIBCO"), on July 6, 2015 (DE #40). For the reasons set forth below, Gallagher's Motion for Summary Judgment (DE #38) is **GRANTED IN PART AND DENIED IN PART.** NIBCO's Motion for Summary Judgment (DE #40) is **DENIED.** Count I of NIBCO's Complaint is **DISMISSED.**


<u>BACKGROUND</u>

For nearly 25 years, Gallagher provided insurance brokerage services to NIBCO. During that time, the parties rarely executed written agreements. In December 2012, Gallagher sent NIBCO invoices for services to be performed in the 2013 calendar year.

NIBCO paid those invoices in full without objection in January 2013. In April 2013, NIBCO notified Gallagher that it had decided to conduct a broker review, and invited Gallagher to participate. Though the broker review process, NIBCO decided to move to a different broker. NIBCO notified Gallagher of its decision and requested a refund of the fees it had paid in January 2013. Gallagher refused to refund the fees. NIBCO's complaint alleges two counts against Gallagher: unjust enrichment (Count I) and breach of implied-in-fact contract (Count II). Gallagher maintains that the fees were fully earned under the parties' implied-in-fact contract, and are not refundable.

NIBCO and Gallagher filed and fully briefed the instant motions for summary judgment. NIBCO's motion seeks a refund of the fees it paid to Gallagher in 2013 under either its breach of implied-in-fact contract claim or its unjust enrichment claim, as well as prejudgment interest. Gallagher's motion argues that NIBCO's breach of implied-in-fact contract claim and unjust enrichment claim are without merit.

FACTS

For the purposes of the parties' motions for summary judgment, the facts below are undisputed:

Gallagher served as NIBCO's insurance broker for approximately 25 years. During that time, Gallagher was responsible for consulting, handling, placing and servicing

insurance coverage for NIBCO.  These services were delivered to NIBCO in three programs of coverage:  property coverage, casualty coverage, and management liability coverage.  The property coverage had a renewal anniversary of July 1, the casualty coverage had a renewal anniversary of December 31, and the management liability coverage had a renewal anniversary of January 1.  The process for renewing property coverage began in March or April, leading up to the July 1 renewal date.  The process for renewing casualty and management liability coverages generally took place during the fall and winter months leading up to their renewal dates.  After the start of the next calendar year, Gallagher provided NIBCO with invoices, auto identification cards, and certificates of insurance.  Gallagher also provided ongoing insurance claim services to NIBCO, including answering claim questions and securing claim advocates on NIBCO's behalf.

The parties rarely reduced their agreements to writing, having done so only in 2010 and 2012.  In 2012, the parties entered into two written agreements:  (1) an agreement for specified "Risk Management Services" (*i.e.,* Gallagher's brokerage services) for which NICBO paid a fee of $157,106 ("2012 Service Agreement"), and (2) an agreement for specified claims-related services for which NIBCO paid a fee of $7,850 ("2012 Claim Agreement") (together, "2012 Agreements").  The 2012 Agreements were based on Gallagher's standard form.  NIBCO paid the fees due under the 2012 Agreements

in January 2012, though the 2012 Agreements were not executed until October 2012.

Both of the 2012 Agreements provide in relevant part:

I. TERM AND TERMINATION
This Agreement shall commence on the Effective Date for a term of one (1) year but may be terminated by either party at any time upon thirty (30) days prior written notice.

II. OBLIGATIONS OF GALLAGHER
Gallagher will provide the services set out on Exhibit A attached hereto (collectively, the "Services") to Client. . . .

III. OBLIGATIONS OF CLIENT
Client shall pay Gallagher an annual fee of . . . for the Services, which such fee may be revised at the time of renewal of this Agreement by the execution of an amendment to this Agreement signed by the parties hereto. . . .

(DE #43-3 at 1, DE #43-4 at 1.) The 2012 Agreements include disclosures that contained different language. Section IV(B) of the 2012 Service Agreement provides: "Gallagher's fees under this Agreement shall be fully earned on the *execution of this Agreement (and any renewal thereof*), and payable on invoicing. . . ." (DE #43-3 at 1 (emphasis added).) In contrast, Section IV(B) of the 2012 Claim Agreement provides, "Gallagher's fees under this Agreement shall be earned on the *Effective Date (and any renewal thereof)*, and payable on invoicing. . . ." (DE #43-4 at 2 (emphasis added).) Neither party explains why these provisions differ.

On December 28, 2012, Gallagher submitted two invoices to NIBCO for "Service Fee – Renewal – Service Fee" ("2013 Invoices").

(DE #43-5, DE #43-6.)  The first invoice itemized the "2013 Service Fee" in the amount of $141,395 for the policy period of December 31, 2012, to December 31, 2013, and had an effective date of December 31, 2012.  (DE #43-6.)  Gallagher charged a lower amount for the 2013 Service Fee ($141,395) than the fee set forth in the 2012 Service Agreement ($157,106).  Neither party explains why the fee for Gallagher's brokerage services decreased for 2013.  The second invoice itemized the "2013 Claim Fee" in the amount of $7,850 for the policy period of January 1, 2013, to January 1, 2014, and had an effective date of January 1, 2013.  (DE #43-5.)  The amount of the 2013 Claim Fee was the same as the amount set forth in the 2012 Claim Agreement.  NIBCO paid both invoices in January 2013, without any dispute as to the amount or any objection to the lack of the execution of new written agreements.  The parties never executed any written agreements for services to be performed in 2013.

In late March 2013, James Seitz ("Seitz") assumed the position of Corporate Risk Manager at NIBCO.  (DE #41-1 at 56.)  On April 16, 2013, Seitz met with Dirk Peterson ("Peterson"), Gallagher's "Client Executive" for the NIBCO account.  During that meeting, Seitz informed Peterson that NIBCO would be conducting a "broker review" to select a new broker, and that Gallagher would be invited to participate in the review, along with other brokers.  Seitz told Peterson that NIBCO was unhappy with its current relationship

with Gallagher and that, if Gallagher wanted to be selected as the new broker, Gallagher would have to offer NIBCO more in both services and pricing. Seitz claims that he told Peterson that NIBCO "intended to terminate its existing brokerage relationship with Gallagher without waiting until the end of the 2013 calendar year," and that "the goal was to select the new broker in time for that broker to assume responsibility for the services associated with placement of NIBCO's casualty and management liability programs that were expiring at year end." (*Id*. at 56–57.) In an email dated April 24, 2013, Peterson wrote to his boss Bob Gorman ("Gorman"), "I don't have a warm and fuzzy here at all. . . . I'm getting the feeling that [Seitz] wants to move the business before even getting to know us." (*Id*. at 88.)

On April 25, 2013, Seitz emailed Peterson a letter inviting Gallagher to participate in NIBCO's broker review. (*Id*. at 81–82.) NIBCO's Request for Proposal ("RFP") stated that the purpose of the broker review was to "evaluat[e] brokers for the placement of the casualty insurance program" with "a renewal date of January 1, 2014." (*Id*. at 83.) The RFP stated that the target date for "BOR's [broker of record] completed for 2014 renewal process" was July 1. (*Id*.)

On May 22, 2013, Gallagher made a presentation to NIBCO for the broker review. On May 24, 2013, Seitz orally informed Peterson that Gallagher had not been selected as NIBCO's broker. The same

day, Gorman confirmed NIBCO's decision to replace Gallagher in an email to NIBCO's Vice Chairman. (*Id.* at 90.) On June 24, 2013, Gallagher employee Dylan Psotka sent an email to another Gallagher employee stating in part that "Gallagher is no longer the broker for NIBCO." (*Id.* at 93.)

On August 15, 2013, Seitz emailed Peterson and his bosses (P.M. Gallagher and Gorman) that "NIBCO has made the decision to move the risk finance broker services to [another broker]," noting that he had "left [Peterson] a voicemail message with this news a few weeks ago but never received a return call." (*Id.* at 7.) Seitz requested that Gallagher "refund at least half of the 2013 service fee plus all of the claims management fee," and expressed his belief that a partial refund "is more than fair compensation for the scope of work required of [Gallagher] during the first half of the year." (*Id.*) Later the same day, Peterson emailed his bosses Gorman and P.M. Gallagher, stating in part:

> Regarding what we've done this year, [NIBCO's] risk manager [(Seitz)] started early in the year and from the get go did not engage us to do much of anything. [Seitz] took over the property [coverage] directly with FM and took away our claim involvement; it was clear from the minute he started that his agenda was to replace us.

(*Id.* at 6.) A few days later, Peterson emailed Gorman and P.M. Gallagher, stating in part:

> Once [Seitz] joined NIBCO, he essentially did not ask us to do hardly anything at all. Also, our fee includes the property [coverage] which has a 7/1 renewal date, but [Seitz] took this over direct before the renewal

> process started. [Seitz] also took over direct claim
> mgt and therefore we did not get a chance to provide any
> claim advocacy work. The reason I mention this is if we
> say we earned 100% of our fee, they can continue to argue
> that we are not deserving of the total amount.

(*Id.* at 10.) Gallagher refused to refund any fees to NIBCO, and this litigation ensued.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine dispute of material fact exists, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir. 2010). A party opposing a properly supported summary judgment motion may not rely on allegations in his own pleading, but rather must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman*

*v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010).

"[I]nferences relying on mere speculation or conjecture will not

suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009)

(citation omitted).  The party with the burden of proof on an issue

can obtain a summary judgment "only where the evidence is so one-

sided that it points inescapably" in the movant's favor, and "every

reasonable jury" would decide that the movant has met its burden

of proof.  *Thorne v. Member Select Ins. Co.,* 899 F. Supp. 2d 820,

824 (N.D. Ind. 2012) (citations omitted).  If the non-moving party

fails to establish the existence of an essential element on which

he bears the burden of proof at trial, summary judgment is proper.

*Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).  Where the

parties file cross-motions for summary judgment, the Court must

consider each motion, but despite the parties' agreement that no

genuine issue of material fact exists, the Court can deny all

motions if the parties do not establish their rights to judgment

as a matter of law.  *See Grabach v. Evans*, 196 F. Supp. 2d 746,

747 (N.D. Ind. 2002).


DISCUSSION

NIBCO asserts two alternative claims against Gallagher:

unjust enrichment and breach of an implied-in-fact contract.  *See*

Fed. R. Civ. P. 8(d).  "Express and implied-in-fact contracts are

traditional contracts, while constructive contracts, 'also

referred to as quantum meruit, contract implied-in-law, [unjust enrichment], or quasi-contracts[,]' are not contracts at all." *Zoeller v. E. Chicago Second Century, Inc.,* 904 N.E.2d 213, 220 (Ind. 2009) (citation omitted, brackets in original).[1] The Court will address NIBCO's breach of implied-in-fact contract claim first.

## Breach of Implied-in-Fact Contract Claim

Count II asserts that NIBCO is entitled to a refund of fees because Gallagher breached the parties' implied-in-fact contract.

> A contract implied in fact refers to the class of obligations which arises from mutual agreement and intent to promise, when the agreement and promise have simply not been expressed in words. Unlike implied in law or quasi-contracts, which do not arise from the parties' express agreement but which are implied by law to remedy a party's wrongful enrichment, a contract implied in fact arises out of acts and conduct of the parties, coupled with a meeting of the minds and a clear intent of the parties in the agreement.

*Nationwide Ins. Co. v. Heck,* 873 N.E.2d 190, 197 n.1 (Ind. Ct. App. 2007) (citations omitted). An implied-in-fact contract is treated like an express contract, "apart from the critical difference in the manner of proving the parties' manifestations of their mutual promises." *ViaStar Energy, LLC v. Motorola, Inc.,*

---

[1]Where, as here, "neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits." *Citadel Group Ltd. v. Washington Reg'l Med. Ctr.,* 692 F.3d 580, 587 n.1 (7th Cir. 2012) (quotation omitted). Thus, the Court will apply Indiana law in deciding these issues.

No. 1:05-cv-1095, 2007 WL 101810, at *6 n.2 (S.D. Ind. Jan. 9, 2007) (citing *F. McConnell and Sons, Inc. v. Target Data Sys., Inc.,* 84 F. Supp. 2d 961, 975 (N.D. Ind. 1999)).  Thus, "[a]n implied-in-fact contract requires the same elements as express contracts, offer, acceptance and consideration; however, it is the conduct of the parties that expresses agreement."  *Garwood Packaging, Inc. v. Allen & Co., Inc.,* No. IP 98-1058, 2002 WL 31924512, at *19 (S.D. Ind. Dec. 26, 2002) (citation omitted).

NIBCO's breach of implied-in-fact contract claim relies in part on the 2012 Agreements.  When interpreting a written contract, Indiana courts

> apply the four-corners rule, which requires that as to any matter expressly covered in the written contract, the provisions therein, if unambiguous, determine the terms of the contract.  Words used in a contract are to be given their usual and common meaning unless, from the contract and the subject matter thereof, it is clear that some other meaning was intended.
>
> [Indiana courts] interpret a written contract by reading the contract as a whole, and . . . attempt to construe the language so as to not render any words, phrases, or terms ineffective or meaningless.  Thus, [the court] must accept an interpretation of the contract which harmonizes its provisions.  If the language of the contract is unambiguous and the intent of the parties is discernible from the written contract, the court must give effect to the terms of the contract.

*DLZ Indiana, LLC v. Greene County*, 902 N.E.2d 323, 327-28 (Ind. Ct. App. 2009) (citation omitted).  The 2012 Agreements are to be construed against Gallagher as the drafter of the agreements.  *See*

*Cmty. Anesthesia & Pain Treatment, L.L.C. v. St. Mary Med. Ctr., Inc.,* 26 N.E.3d 70, 74 (Ind. Ct. App. 2015).

Gallagher asserts that the parties had an implied-in-fact contract in 2013, and that the contract had the same terms as the 2012 Agreements. "When one serves another under a contract for a year's service and holds over, continuing in the same service after the expiration of the year, there is a presumption . . . that the parties assent to the continuance through another year of the contract of service." *Akron Milling Co. v. Leiter*, 107 N.E. 99, 103 (Ind. Ct. App. 1914); *see* 6 Ind. Law Encyc. Contracts § 5 (Jan. 2016) ("Where the parties have been operating under an express contract, and continue to conduct themselves after the expiration of that contract as if it were still in force, an implied contract with the same terms as the express contract exists between them."); 17 C.J.S. Contracts § 6 (2015) ("Where, without more, an agreement expires by its terms and the parties continue to perform as before, an implication arises that they have mutually assented to a new contract containing the same provisions as the old."). The existence of an implied-in-fact contract is supported by NIBCO's and Gallagher's longstanding business relationship, during which they rarely executed written agreements. Moreover, when Gallagher issued the invoices for the "2013 Service Fee" and "2013 Claim Fee," indicating that each fee was "Service Fee – Renewal – Service Fee," NIBCO paid both invoices in full without objection.

In response, NIBCO addresses the 2012 Service Agreement and the 2012 Claim Agreement separately. NIBCO argues that the terms of the 2012 Service Agreement did not extend to an implied-in-fact contract for Gallagher's brokerage services in 2013. NIBCO maintains that two provisions of the 2012 Service Agreement required the execution of a renewal or amended agreement in order to be extended. Section IV(B) states that "Gallagher's fees under this Agreement shall be fully earned on the execution of this Agreement (and any renewal thereof), and payable on invoicing." (DE #43-3 at 1.) Section III states that NIBCO "shall pay Gallagher an annual fee of $157,106 for the Services [("2012 Service Fee")], which such fee may be revised at the time of renewal of this Agreement by the execution of an amendment to this Agreement signed by the parties hereto." (*Id.*) NIBCO maintains that the 2012 Service Agreement was never renewed because the 2013 Service Fee differed from the 2012 Service Fee, and the parties never executed any amendment or renewal of the agreement for 2013.

Gallagher maintains that no language in the 2012 Service Agreement supports NIBCO's argument that execution of a new agreement was required as a condition precedent to renewal. "A contractual condition precedent is a condition that must be performed before the agreement of the parties becomes a binding contract or that must be fulfilled before the duty to perform a specific obligation arises." *L.H. Controls, Inc. v. Custom*

*Conveyor, Inc.,* 974 N.E.2d 1031, 1050 (Ind. Ct. App. 2012) (citation omitted). Gallagher argues that Section IV(B) clearly and unambiguously provides that its fees were "fully earned" upon the execution of the 2012 Service Agreement "and any renewal thereof." It insists that the only logical interpretation of this provision is that Gallagher fully earned the 2012 Service Fee upon the execution of the 2012 Service Agreement, and fully earned the 2013 Service Fee upon the renewal of the agreement in 2013.

NIBCO responds that Section IV(B) is ambiguous and can be interpreted as requiring not merely "execution of this Agreement," but also "execution of . . . (any renewal thereof)" before Gallagher earned the fees for the renewal period. (DE #45 at 3.) NIBCO insists that Section IV(B) be construed against Gallagher as the drafter of the agreement. "A contract term is not ambiguous merely because the parties disagree about the term's meaning. Rather, language is ambiguous only if reasonable people could come to different conclusions about its meaning." *Simon Property Group, L.P. v. Michigan Sporting Goods Distributors, Inc.,* 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005) (citation omitted). The Court finds that Section IV(B) is ambiguous because reasonable people could come to different conclusions about whether it requires the execution of only the 2012 Service Agreement, or execution of both the 2012 Service Agreement and a renewal of that agreement. Where, as here, the contract language is subject to more than one

construction, "the intention of the parties is a question of fact and resort to extrinsic evidence is proper." *Stoneware, Inc. v. TecServ, Inc.,* No. 1:07-cv-1188, 2009 WL 5175193, at *7 (S.D. Ind. Dec. 21, 2009) (citing *Anderson v. Horizon Homes, Inc.,* 644 N.E.2d 1281, 1290 (Ind. Ct. App. 1995)).

As evidence of the parties' intent regarding Section IV(B), Gallagher points to NIBCO's payment of the 2013 Service Invoice without requesting a written renewal of the 2012 Service Agreement, and NIBCO's failure to object to Gallagher's performance of some services in 2013. Gallagher also cites the fact that the parties did business together for years without written agreements, and rarely executed agreements throughout their course of dealing. (DE #44 at 12-13.) But this evidence does not necessarily demonstrate the parties' intent to renew the 2012 Service Agreement without executing a written renewal. It just as easily demonstrates an intent to return to doing business together without a written agreement. Moreover, because Gallagher drafted the 2012 Service Agreement, the ambiguity in Section IV(B) must be construed against it. *See St. Mary Med. Ctr., Inc.,* 26 N.E.3d at 74. The Court therefore finds that Section IV(B) required the execution of a written renewal of the 2012 Service Agreement in order to renew that agreement.

Gallagher also maintains that there is only one logical interpretation of Section III: that the 2012 Service Fee was set

for the annual term of service and not subject to modification until the time of renewal, and that the parties' consent to the alteration of the 2013 Service Fee "was to be evidenced by the execution of an amendment to the agreement." (DE #44 at 9.) Gallagher insists that this interpretation does not equate to a condition precedent.

The Court finds Section III's provision that the "fee may be revised at the time of renewal of this Agreement by the execution of an amendment to this Agreement signed by the parties hereto" to be clear and unambiguous. Indeed, to find that Gallagher's revision of the fee amount did not require a signed amendment would improperly render this phrase "ineffective or meaningless." *DLZ Indiana*, 902 N.E.2d at 327. It is undisputed that Gallagher charged NIBCO different amounts for the 2012 Service Fee and the 2013 Service Fee. It is also undisputed the parties never executed an amendment to the 2012 Service Agreement. Because Section III provides that a revision of the fee is to be executed in a signed amendment to the 2012 Service Agreement, and the parties did not sign such an amendment, they did not renew the 2012 Service Agreement.[2]

_____

[2] In its reply brief, Gallagher argues that even if the decrease in the amount of the service fee in 2013 required an amendment of the 2012 Service Agreement, NIBCO waived this condition by paying the 2013 Service Fee without objection, and thereby renewed the 2012 Service Agreement. (DE #44 at 10-11.) Because NIBCO has not had the opportunity to respond to this argument, and the Court has

NIBCO claims that "[b]ecause the express language of the 2012 Service Agreement did require a formal, written signed agreement to be renewed, the [C]ourt may not infer the existence of an implied-in-fact contract as to the parties' relationship arising from NIBCO's payment of the 2013 Service Fee and must instead analyze that relationship under the doctrine of implied-in-law contracts and unjust enrichment." (DE #45 at 4.) NIBCO cites *Nationwide Insurance Company v. Heck* for the proposition that "[w]hile there is no written agreement signed by the parties, the validity of a contract is not dependent on the signature of the parties*, unless such is made a condition of the agreement.*" 873 N.E.2d at 196 (citation omitted, emphasis added). In *Nationwide*, the court found that an implied-in-fact contract existed between the parties based an unsigned email setting forth terms of the parties' agreement. The court explained that an implied-in-fact contract "arises out of the acts and conduct of the parties, coupled with a meeting of the minds and a clear intent of the parties in the agreement." *Id*. at 196 n.1. "Some form of assent to the terms is necessary," and "may be expressed by acts which manifest acceptance." *Id*. at 196. While Nationwide argued that

---

already found that the 2012 Service Agreement was not renewed based on other grounds, the Court will not address this argument. *See Nationwide Ins. Co. v. Central Laborers' Pension Fund,* 704 F.3d 522, 527 (7th Cir. 2013) ("[i]t is well established that arguments raised for the first time in a reply brief are waived") (citation omitted).

it never entered into the agreement, the court found no evidence that the parties' signatures were a condition of the agreement, and determined that the conduct of Nationwide's agent demonstrated the existence of the agreement. *Id*. at 197.

*Nationwide* does not address the issue of whether parties can create an implied-in-fact contract after the expiration of a written agreement that required a signed amendment for its renewal. Neither party cites any case law addressing this issue, nor was the Court able to find such case law in Indiana.[3] However, Indiana

---

[3] The District of Minnesota has addressed the issue of whether parties created a new implied-in-fact contract after a written agreement expired. In *Webb Candy, Inc. v. Walmart Stores, Inc.*, the parties' written agreement provided that it could not be extended except by a formal, signed document. No. 09-CV-2056, 2010 WL 2301461, at *6 (D. Minn. June 7, 2010). The parties had not signed such document, but continued to do business after the written agreement expired. The court explained:

> [W]hen parties continue to perform under an expired contract, their conduct can give rise to a new, implied-in-fact contract. But the fact that parties to an expired contract continue to deal with one another does not mean that they necessarily create a new contract — or, if they do, that every term of the expired contract becomes part of the new contract. The presumption of a new, implied-in-fact contract may be rebutted with evidence that the parties did not intend to create a new contractual relationship or did not intend to be bound by certain terms of the expired contract.

*Id.* at *8 (citations omitted). Notwithstanding the expired agreement's provision that it could not be extended except by a signed document, the court considered the parties' conduct and intent after the agreement had expired. *Id*. at *10 (denying motion to dismiss because the court could not find as a matter of law that an implied-in-fact contract existed where the parties' course of conduct changed after the written agreement expired).

law recognizes that "circumstances may have arisen, or acts may have been done which, according to the dictates of reason and justice, and the ordinary course of dealing, or the common understanding of men, show a mutual intention to contract, in which case an implied-in-fact contract arises." *F. McConnell and Sons*, 84 F. Supp. 2d at 975 (citation omitted). "A contract can be implied in fact when the conduct of the parties infers a meeting of the minds, even in the absence of an express contract." *L.I. Combs & Sons, Inc. v. Indiana/Kentucky Reg'l Council of Carpenters*, No. 2:09CV150, 2010 WL 4553664, at *4 (N.D. Ind. Nov. 3, 2010) (citations omitted). "All that is required to render a contract enforceable is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom; absolute certainty in all terms is not required." *Zukerman v. Montgomery*, 945 N.E.2d 813, 819 (Ind. Ct. App. 2011) (citation omitted).

The parties' conduct following the expiration of the 2012 Service Agreement demonstrates that an implied-in-fact contract existed for Gallagher's brokerage services in 2013. *See Paper Mfrs. Co. v. Rescuers, Inc.,* 60 F. Supp. 2d 869, 883 (N.D. Ind. 1999) (determining as a matter of law that a contract existed where it was "clearly evidenced by the course of dealings between the parties"). The evidence of an offer, acceptance, and consideration are undisputed. The parties do not dispute the types of services Gallagher had provided to NIBCO over their 25-year relationship

(often without any written agreement), or that Gallagher intended to continue to provide such services to NIBCO in 2013. They do not dispute that Gallagher sent NIBCO an invoice for the 2013 Service Fee for the policy period of December 31, 2013 to December 31, 2014, and that NIBCO paid the 2013 Service Fee in full without objection in January 2013.

While NIBCO argues that Gallagher performed virtually none of the services for which it had paid in January 2013, the undisputed evidence demonstrates that the bulk of Gallagher's services were to occur later in the year. Historically, Gallagher began its renewal services for NIBCO's property coverage in March or April, and its renewal services for NIBCO's casualty and management liability coverages in the fall. Evidence also indicates that it was not until after Seitz became NIBCO's risk manager in late March 2013 that NIBCO "took away" the renewal of property coverage and claim services from Gallagher. (*See* DE # 41-1 at 6 (asserting that Seitz "took over property [coverage] . . . and took away [Gallagher's] claim involvement"), 10 (asserting that Seitz took over property coverage "before the renewal process started. [Seitz] also took over direct claim mgt").) NIBCO's subsequent decision to terminate Gallagher's brokerage services further indicates that the parties had intended to create an implied-in-fact contract in early 2013. Based on this undisputed evidence, the Court finds that an implied-in-fact contract existed for

Gallagher's brokerage services in 2013, after the expiration of the 2012 Service Agreement ("Implied Service Contract").

Turning to the 2012 Claim Agreement, NIBCO admits that "the relationship arising from NIBCO's payment of the 2013 Claim Fee may be subject to the doctrine of implied-in-fact contracts" (DE #45 at 4 n.3), and that "the 2012 Claim Agreement arguably was renewed for 2013 pursuant to the doctrine of implied-in-fact contracts." (*Id*. at 10 n.4.) As NIBCO concedes, it arguments against the extension of the terms of the 2013 Service Agreement do not apply to the 2012 Claim Agreement. (*Id*. at 4 n.3.) The 2012 Claim Agreement states that Gallagher's fee "shall be earned on the Effective Date (and any renewal thereof)." (DE #43-4 at 2.) Gallagher issued an invoice for the 2013 Claim Fee, indicating it was a "Renewal" with an "Effective Date" of January 1, 2013. (DE #43-5.) NIBCO paid that invoice in full without objection. Moreover, the amount of the 2013 Claim Fee was the same as the fee set forth in the 2012 Claim Agreement. The Court therefore finds that a second implied-in-fact contract existed for Gallagher's claim services in 2013 based on the parties' renewal of the 2012 Claim Agreement ("Implied Claim Contract").

Implied-In-Fact Contracts' Termination Provision

Having found that two implied-in-fact contracts existed in 2013, the Court turns to the issue of whether these contracts included a right of refund upon termination. Both NIBCO and

Gallagher rely on the termination provision of the 2012 Agreements as evidence of the parties' intent regarding the implied-in-fact contracts.  Section I of the 2012 Agreements states, "[t]his Agreement shall commence on the Effective Date for a term of one (1) year but may be terminated by either party at any time upon thirty (30) days written notice."  (DE #43-4, DE #43-4.)

The Court will first address whether Section I allowed a party to terminate the 2012 Agreements midterm.  Gallagher asserts that the parties did not intend for either party to cancel the agreements midterm, but rather, intended for the agreements to provide for an annual term of service.  As evidence of the parties' intent, Gallagher points to the annual fees, and the lack of any mention of a return of fees in the 2012 Agreements.  Gallagher also notes that during the parties' business relationship of nearly 25 years, Gallagher's services were ongoing and continuously provided, carrying over from one year into the next.  According to Gallagher, Section I merely provided a mechanism for either party to terminate the agreement at the end of the term by providing written notice.

NIBCO argues that Gallagher's interpretation of Section I nullifies the phrase "at any time," and conflates the words "termination" and "renewal."  NIBCO asserts that if the parties had intended Section I merely to allow parties to avoid renewing the agreement, they would have used different language than

"termination" was permitted "at any time" upon 30 days' written notice.  The Court finds that Section I clearly allows termination of the agreements "at any time," rather than at the end of the term, as Gallagher suggests.  *See, e.g., Tech. Marketing Corp. v. Hamlin, Inc.*, 974 F. Supp. 1224, 1227 (W.D. Wis. 1997) (applying Indiana law to find "nothing ambiguous" about a termination clause that "plainly provides that either party can terminate the agreement by giving thirty days written notice"); *Comm. Maint., Inc. v. Motorola, Inc.,* 761 F.2d 1202, 1210 (7th Cir. 1985) (applying Indiana law to find that a clause that "[e]ither [party] may terminate this agreement, with or without cause, upon thirty days written notice to the other party" was correctly enforced "according to its clear and express terms").  Nothing in Section I suggests that notice of termination only applies to the renewal of the agreement.  Therefore, the Court finds that NIBCO had the right to terminate the implied-in-fact contracts midterm.[4]

_____

[4]NIBCO also asserts that the fact that the 2012 Agreements provide for the upfront payment of annual fees does not mean that the parties intended an annual term of service.  NIBCO points to Section I, which allows termination "at any time," as evidence that they did not presuppose an annual term.  NIBCO analogizes Gallagher's position to an employee who contends that his employment was fixed for a year because his compensation was expressed in terms of an annual salary.  Indiana courts have held that such employment was at will, despite the fact that the employee's salary was stated in annual terms. *Bee Window, Inc. v. Turman*, 716 N.E.2d 498 (Ind. Ct. App. 1999); *Butts v. Oce-USA, Inc.*, 9 F. Supp. 2d 1007 (S.D. Ind. 1998).  The Court finds these cases to be inapposite.  As explained in *Bee Window*, "[s]tating compensation and other benefits in annual terms is both common and

Gallagher maintains that, even if NIBCO could terminate the agreements midterm, it is not entitled to a refund upon termination. Gallagher insists that the terms of the 2012 Agreements do not imply a right to refund. The 2012 Agreements do not contain any provision explicitly entitling NIBCO to a refund. Moreover, both of the 2012 Agreements provide that the fees are "earned" on a particular date.

NIBCO does not cite any evidence that the 2012 Agreements, or the subsequent implied-in-fact contracts, explicitly include a right to a refund. Rather, NIBCO asserts that Section I implicitly provides for a refund of fees upon termination. According to NIBCO, its right to terminate the agreements would be "nonsensical" and "meaningless" unless NIBCO was entitled to a refund of all unearned, prepaid fees. (DE #41 at 10.) Noting the bilateral nature of Section I, NIBCO maintains that if Gallagher had terminated the agreements midyear, Gallagher would have been required "under basic principles of fairness" to refund the entire fee paid by NIBCO, reduced only by whatever sums correlated to services performed by Gallagher before termination. (*Id.*) NIBCO does not cite any case law for this principle.

---

convenient, but does not necessarily mean that the employment is for a definite period of one year." 716 N.E.2d at 501. Here, in contrast, the 2012 Agreements do not merely state Gallagher's fees in annual terms. Rather, each agreement clearly states that it has "a term of one (1) year," and that the fee was "earned" on a particular date and was payable on invoicing.

NIBCO also asserts that the 2012 Agreements are ambiguous as to Gallagher's duty to refund fees to NIBCO upon termination. According to NIBCO, the general rule of commercial reasonableness dictates that the 2012 Agreements be construed to entitle NIBCO to a refund of unearned fees upon termination because to do otherwise would result in a windfall gain to Gallagher. Commercial reasonableness provides "guidance for interpreting ambiguous contracts. . . . If one reading produces a plausible result for which parties might be expected to bargain, that reading has a strong presumption in its favor as against another reading producing an unlikely result." *Utica Mut. Ins. Co. v. Vigo Coal Co., Inc.,* 393 F.3d 707, 711 (7th Cir. 2004) (citations and internal quotations omitted). But this presumption only comes into play when interpreting ambiguous agreements. "[I]nferring additional obligations (reasonableness []) into the parties' contract does not accurately describe the duties and responsibilities of courts in interpreting contracts. Rather, the proper posture for the court is to find and enforce the contract as it is written and leave the parties where it finds them." *Rothe v. Revco D.S., Inc.*, 148 F.3d 672, 675 (7th Cir. 1998) (citation, internal quotations and brackets omitted).

NIBCO cites no case law holding that a right to terminate implies an entitlement to a refund, and the Court was unable to locate any. While not cited by either party, *Seko Air Freight,*

*Inc. v. Transworld Systems, Inc.*, 22 F.3d 773 (7th Cir. 1994),

sheds light on this issue.  In that case, Seko sued a debt collector

to recover an amount it prepaid for the right to send accounts for

collection over two years.  Eight months into the agreement, Seko

terminated the collection agreement without sending any accounts

to debt collector, and asked for its money back.  The termination

clause of the agreement allowed Seko to terminate with written

notice, but did not mention any right to a refund.  Like NIBCO,

Seko argued that the presence of a termination clause implied an

entitlement to a refund, although the agreement lacked any

provision for a refund.  The Seventh Circuit rejected this

argument, noting that there are "many other situations in which

one side's ability to walk away from a transaction does not

establish an entitlement to a refund."  *Id.* at 774 (listing

examples).  The Seventh Circuit held that "there is no general

rule that a right to terminate implies a right to a refund; the

question, rather, is how best to understand this particular

contract."  *Id*.  Under the terms of the collection agreement, "Seko

was entitled, but not obliged, to use" the defendant's services;

"the termination clause ensured that if Seko used some of the

services, it could quit at any time.  Understanding that the

[prepayment] pays for the option to use [the defendant's] services

shows that the payment is not refundable in full." *Id*. at 775

(affirming summary judgment in favor of the debt collector).[5]

Because there is no general rule that a right to terminate
implies a right to refund, the Court will look to the implied-in-fact contracts to determine whether NIBCO was entitled to a refund
upon termination. In interpreting the Implied Claim Contract, the
Court looks to the terms of the 2012 Claim Agreement. The 2012
Claim Agreement states that Gallagher's fee was "earned" on the
Effective Date, allows either party to terminate the agreement "at
any time," and does not refer to any right to a refund. These
provisions, taken together, indicate that there was no right to a
refund upon termination in the 2012 Claim Agreement. Because no
provision in the 2012 Claim Agreement required any refund upon
termination, the Court will not imply one for the Implied Claim
Contract.

Interpreting the Implied Service Contract is more complex.
As explained above, the Court has found that the Implied Service
Contract was not based on a renewal of the 2012 Service Agreement,
but rather, was based on the parties' conduct and intent. "[T]he
terms of a contract not reduced to writing are a matter to be
interpreted by the trier of fact." *Paper Mfrs. Co.,* 60 F. Supp.

---

[5] Because Seko sought reimbursement of the full amount, the Seventh
Circuit did not address whether any portion of the payment would
be refundable. *Seko Air Freight*, 22 F.3d at 775.

2d at 883 (citing *Ballew v. Town of Clarksville*, 683 N.E.2d 636, 639 (Ind. Ct. App. 1997)).  Here, the parties concede that Section I applies to the Implied Service Contract, and agree that this termination provision contains no explicit right to a refund.

Gallagher argues that Section IV(B) also applies to the Implied Service Contract, and that NIBCO is not entitled to a refund because Gallagher's fees were "fully earned" upon renewal. NIBCO asserts that if Section IV(B) applies, Gallagher never earned its fees because the parties never executed a renewal agreement. As explained above, the Court finds that Section IV(B) required the parties to execute a written renewal of the 2012 Service Agreement in order to renew that agreement.  Because the parties did not do so, they did not extend Section IV(B) to the Implied Service Contract.

Gallagher also points to the parties' course of conduct as demonstrating that NIBCO had no right to a refund under the Implied Service Contract.  NIBCO's payment of the 2103 Service Invoice without objection and its acceptance of services in 2013 allegedly demonstrated its intent to proceed in accordance with the parties' usual course of dealings, which Gallagher asserts did not include a right to a refund upon termination.  NIBCO maintains that the termination provision (Section I) implies a right to a refund, and notes a lack of extrinsic evidence regarding the parties' intent regarding refunds.  (*See* DE #41 at 10-11 (asserting that the

parties never discussed the meaning of the termination provision in the 2012 Agreements or attempted to exercise a termination provision prior to 2013) (citing DE #41-1 at 53-54).) The Court finds that the evidence of the terms of the Implied Service Contract is not "so one-sided that it points inescapably" in either NIBCO's or Gallagher's favor. *See Thorne*, 899 F. Supp. 2d at 824. Rather, genuine issues of material fact exist as to whether the terms of the Implied Service Contract included a right to a refund upon termination.[6]

<u>Voluntary Payments Doctrine</u>

Gallagher also argues that NIBCO is not entitled to a refund based on the voluntary payments doctrine. The voluntary payments doctrine states that "money voluntarily paid in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient may not be recovered, on the ground of 'mistake,' merely because the payment is subsequently revealed to have exceeded the true amount of the underlying obligation." *Time Warner Entm't Co., L.P. v. Whiteman*, 802 N.E.2d 886, 892 (Ind.

---

[6] At least one other jurisdiction has found that where a written agreement had expired, "[w]hether [the parties] intended to be bound by a new contract with the same terms presents a factual question, and, except in the clearest cases, the question is for the finder of fact to resolve." *City of Scottsbluff v. Waste Connections of Nebraska, Inc.,* 809 N.W.2d 725, 740 (Neb. 2011) (finding that after a written agreement expired, the parties operated under an implied-in-fact contract with different terms).

2004) (citation omitted). Gallagher maintains that NIBCO's claim for a refund fails as a matter of law because the 2012 Agreements unambiguously provided that fees were earned on renewal, and NIBCO voluntarily paid the fees in 2013.

NIBCO responds that the voluntary payments doctrine does not apply here because there was no "recognized uncertainty as to the existence or extent" of NIBCO's obligation to Gallagher. *Id.* The Court agrees. *See CSX Transp., Inc. v. Appalachian Railcar Servs., Inc.*, 509 F.3d 384, 387 (7th Cir. 2007) (voluntary payments doctrine "has no application to the payment of a claim that neither party regards as doubtful") (citation omitted). There is no evidence that the amount of Gallagher's fees was in dispute when NIBCO paid them in January 2013. Moreover, there is no evidence of a "recognized uncertainty" regarding NIBCO's ability to obtain a refund when NIBCO paid those fees. Gallagher presents no evidence that NIBCO knew it had a right of refund and was intentionally relinquishing this right by paying the fees in 2013. For these reasons, the Court finds that the voluntary payments doctrine does not apply here.

Timing of NIBCO's Notice of Termination

The parties raise an issue of fact regarding the timing of NIBCO's notice of termination.[7] Gallagher asserts that Section I

---

[7]Neither party raises a legal argument relating to the timing of NIBCO's notice of termination. However, the Court recognizes that

required NIBCO to provide written notice of termination, and that NIBCO did not do so until August 2013. NIBCO responds that Gallagher received notice of termination when it received NIBCO's RFP in April 2013. The RFP stated that its purpose was to select the broker responsible for placement of NIBCO's casualty insurance program with a renewal date of January 1, 2014. According to NIBCO, due to the lead time required to place such a program, the RFP necessarily informed Gallagher that the broker selected would need to begin performing work by the fall of 2013. Gallagher argues that the RFP did not indicate that NIBCO intended to terminate Gallagher's employment before the end of 2013, as it stated that the new broker would take effect for only the casualty program (one of three programs Gallagher serviced for NIBCO). Because NIBCO invited Gallagher to participate in the broker review process, Gallagher allegedly believed that NIBCO might select Gallagher to continue its role as broker after 2013.

NIBCO also argues that Gallagher had actual notice of termination based on oral communications between NIBCO and Gallagher. *See Goodman Jewelers, Inc. v. Walnut Brewery, Inc.,* No. 1:10-cv-01392, 2011 WL 3667714, at *5 (S.D. Ind. Aug. 22, 2011) ("where actual notice indisputably occurred, minor deviations from

---

if the Implied Service Contract is found to include a right to a refund upon termination, the timing of NIBCO's notice of termination may impact the amount of a refund of Gallagher's unearned fees.

the contract terms governing notice do not render the notice defective"). NIBCO points to evidence of a meeting between Seitz and Peterson on April 16, 2013, in which they discussed NIBCO's dissatisfaction with the parties' relationship, and NIBCO's intent to conduct a broker review. While NIBCO asserts that Seitz notified Peterson of the termination at this meeting, an April 24, 2013 email from Peterson to his boss does not indicate a clear understanding that the relationship between NIBCO and Gallagher had terminated, but rather, the possibility that the relationship would end. Peterson states that, "I don't have a warm and fuzzy here at all . . . I'm getting the feeling that [Seitz] wants to move the business before even getting to know us." (DE #41-1 at 88.)

NIBCO also asserts that Seitz told Peterson in May 2013 that Gallagher had not been selected as NIBCO's new broker. Gallagher responds that when Seitz informed Peterson that NIBCO had not selected Gallagher, he did not indicate that NIBCO was terminating their relationship midterm. However, a June 2013 email between two Gallagher employees stated that Gallagher was no longer NIBCO's broker. Based on this and other conflicting evidence, the Court finds that the parties raise a genuine issue of material fact as to the timing of NIBCO's notice of termination.

Unjust Enrichment Claim

NIBCO's Complaint also alleges a claim of unjust enrichment against Gallagher. An unjust enrichment claim "is a legal fiction invented by the common law courts in order to permit a recovery . . . where the circumstances are such that under the law of natural and immutable justice there should be a recovery." *Zoeller*, 904 N.E.2d at 220 (citation omitted). To prevail on an unjust enrichment claim, a plaintiff "must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Id.* (citation omitted). NIBCO claims that it conferred a measurable benefit on Gallagher by prepaying the fees for Gallagher's services in 2013. NIBCO asserts that Gallagher performed virtually no services in exchange for the 2013 fees, and that NIBCO gave Gallagher 30 days' notice of termination.

Gallagher argues that NIBCO's unjust enrichment claim fails because an unjust enrichment claim is not actionable where there is a contract between the parties. *See id.* at 221. A claim for unjust enrichment is not cognizable where an implied-in-fact contract governs the parties' behavior. *See CoMentis, Inc. v. Purdue Research Found.*, 765 F. Supp. 2d 1092, 1102 (N.D. Ind. 2011) ("where an express contract governs the parties' behavior, a claim for unjust enrichment is not cognizable.") (citations omitted); *F.*

*McConnell and Sons,* 84 F. Supp. 2d at 975 (noting that "the difference between express and implied-in-fact contracts is merely semantic, and there is no legally significant difference between [them]"). NICBO responds that its unjust enrichment claim was pled in the alternative to its implied-in-fact contract claim.

A plaintiff seeking recovery for breach of contract may plead unjust enrichment in the alternative "because this theory allows for the possibility of recovery even if the court finds that no contract existed or that a contract existed but was unenforceable." *CoMentis*, 765 F. Supp. 2d at 1102. However, "[o]nce a valid contract is found to exist, quasi-contractual relief is no longer available." *Id.* at 1103 (citation omitted). The Court has found that implied-in-fact contracts existed for Gallagher's brokerage services and claim services in 2013. Therefore, NIBCO's claim for unjust enrichment is no longer available. NIBCO's claim for unjust enrichment (Count I) is **DISMISSED**.

Prejudgment Interest

NIBCO seeks prejudgment interest on its alleged damages. The Court has found that NIBCO is not entitled to a refund of the 2013 Claim Fee under the Implied Claim Contract, and has dismissed NIBCO's claim for unjust enrichment. The Court has also found that a genuine issue of material fact exists as to whether the Implied Service Contract includes a right to a refund upon

termination.  For these reasons, NIBCO's request for prejudgment interest is **DENIED.**


CONCLUSION

For the reasons set forth above, Gallagher's Motion for Summary Judgment (DE #38) is **GRANTED IN PART AND DENIED IN PART.** NIBCO's Motion for Summary Judgment (DE #40) is **DENIED.**  Count I of NIBCO's Complaint is **DISMISSED.**


DATED:  March 29, 2016          /s/ RUDY LOZANO, Judge
                                **United States District Court**